## ARTHUR D. MARTIN

### *v.*

### THE STATE OF ILLINOIS.

#### *Opinion filed January 21, 1903.*

CONTRACTS—*for labor of convicts.* The Court on re-hearing reviews the evidence and adheres to the former opinion of the Commission rejecting the claim.

The claim in this case was filed by claimant, February 25, 1898, for the sum of $34,737.19. The cause was heard at the August session, A. D. 1898, of the Commission and an opinion rendered and filed in the cause on the 30th day of December, 1898, rejecting the claim. A petition for rehearing was filed in the cause January 14, 1899, and rehearing was granted March 22, 1899.

The claim is based upon two contracts, entered into by the claimant, with the Commissioners of the State Penitentiary at Joliet, for the balance of the commissions due claimant, for the sale of chairs as provided in said con-

tracts and for damages sustained by claimant, by reason of a breach on the part of said Commissioners of said contracts.

The balance due on commissions claimed, was for the sum of $20,737.19, and the damages claimed were for the sum of $14,000. As will be observed from the former opinion rendered in the cause, the claimant, by his attorneys, at the former hearing waived his claim for damages for $14,000 and the only matter in controversy at the former trial was the balance claimed to be due as commissions which is the only matter in controversy at the present hearing.

The first contract bears date June 20, 1893, and provides for the establishment of a chair factory at the penitentiary and that claimant for devoting his time exclusively to the management and conduct of the business, and selling the manufactured product was to be compensated by a commission of fifteen per cent on the gross sales of the business, as long as the earnings of the men (convicts) employed to do the work in the factory, amounted to less than sixty cents per man, per day.

The contract further provided that an additional commission of five per cent making the total commission twenty per cent should be allowed when the business, on its gross product, developed an earning of sixty cents per man employed, per day; it being understood and agreed that in ascertaining such earnings, the interest on the amount invested in the plant and the business, shall be computed at the rate of six per cent per annum, and all such interest together with the cost of power, cost of material, cost of civilian labor and teaming, and commission paid claimant be deducted from the gross receipts of the business.

· The second contract bears date September 1, 1894, and provides that the first contract be abrogated, and should only remain in force and effect to enable the parties to adjust and settle their accounts to the date of the second contract, according to their respective rights and for no other purpose.

It was not provided in the second contract that claimant should thereafter have the management of the business; but it provided that he should sell the product of the plant and be compensated by the same commissions allowed in the first contract, and to be paid monthly.

Claimant sold chairs, manufactured in the penitentiary, under the second contract, until March 1, 1896, and on the second day of March, 1896, by mutual consent, the contract was cancelled and annulled, by agreement in writing.

The record contains certified copies of the vouchers issued to claimant, for commissions during the existence of both contracts, which vouchers are receipted in full by claimant.

It is contended by claimant that these vouchers were not intended to be in full of the extra five per cent commission, to be allowed in case the prison labor should reach or exceed sixty cents per day, per man. The Commission in the opinion rendered in the former case held that there was not sufficient evidence at that time in the record to establish the fact that the earnings of the men, amounted to sixty cents per day, per man employed; and also held that the vouchers issued to claimant, and receipted by him in full, showed an adjustment in full of the accounts between the parties.

There is no member of the present Commission, who was a member of the Commission at the former hearing, and we find no written reasons on file, in the case for the granting of the rehearing. It appears, however, from the petition on file for a rehearing, that it was urged that the evidence of the warden of the penitentiary should be taken in the case, and a full opportunity given claimant to examine the books of the penitentiary and ascertain the earnings of the prisoners for the period in question. Since granting the rehearing the claimant has caused the books of account at the penitentiary to be examined by Seymour Walton, an expert accountant, and has taken his evidence in the case. Walton, testified

that from an examination of the books he found, that the earnings of the prisoners, during the period of the first contract, did not amount to sixty cents per day, per man, but that during the period of the second contract, did amount to sixty cents per day, per man.  He stated, however, in his direct examination that it was impossible to make an accurate statement of the cost to manufacture the chairs during the whole period of the second contract, exclusive of labor, because, there was no inventory taken at the end of that period.  He further stated, however, that he was able to make an accurate statement as shown from the books of the cost of manufacturing chairs from the first day of September, 1894, to August 31, 1895, inclusive, exclusive of labor, and that the cost for said year, as appeared from the books, was $109,695.77, and that he arrived at the total cost of the manufacturing of the chairs for the eighteen months during which the second contract was in existence by adding one half the cost of the first year which would make a total cost of manufacturing chairs for said eighteen months, exclusive of labor, $164,543.65.  He further stated in his direct examination that the total gross sales for the eighteen months, as shown by the books were $257,079.47.  He further stated in his cross-examination that the number of days, prison labor, as shown by the books of the men employed, in and for, the chair department, September 1, 1894, to August 31, 1895, was 56,533; and the number of days, prison labor, beginning September 1, 1895, and ending February 29, 1896, was 29,043.  This of course, would make a total number of days prison labor in the chair department, under the second contract of 85,576.  He stated on cross-examination that in ascertaining the earnings of the convicts, per man, per day, he divided the difference between the cost of manufacture, as shown by the books, and the gross sales, by the number of working days of the convicts, as shown by the check roll.  He stated also, that in ascertaining the total cost he had not included the interest on the plant or the commissions of claimant as

provided by the contract. He stated that he did not find these amounts on the books and be went by the books altogether and not by the contracts. Now if we deduct the total cost to manufacture, as found by the expert, under the second contract, which was $164,543.65, from the total gross sales, $257,079.43, we have remaining $92,535.82, which if divided by the total number of men employed, as shown by the check roll, would amount to more than sixty cents per day, per man. The contracts provided, however, that interest at the rate of six per cent per annum, on the amount invested in the plant and business, and the commissions to be allowed should be included in the cost and deducted from the gross sales, in ascertaining the earnings of the convicts. The accountant stated that the interest on the plant and business would amount to $3,311.54.

The amount of commissions, at twenty per cent on $257,079.47 would be $51,415.89, which added to the interest would amount to $54,727.43. If we add this amount to the $164,543.65, the amount of cost found by the accountant, which did not include interest and commissions we will have $219,271.08, and if we deduct this amount from $257,079.47, the amount of gross sales, we will have remaining $37,808.39. If we divide this latter amount by eighty-five thousand five seventy-six, being the number of men employed as shown by the check roll, we find that the earnings of the men would be about 44 cents per man, per day.

We are of the opinion that the testimony of the expert witness fails to establish that the convicts during the period of the second contract earned the sum of sixty cents per day per man.

Claimant has also taken evidence since the former hearing to show that the charges for power and steam, were exorbitant and unreasonable, but if we make an allowance for an extra charge for power and steam we would be unable to find from the record, as it stands, that the convicts earned sixty cents per day, per man, according to the contract.

The evidence of Robert L. Allen, who was warden of the penitentiary, during the existence of both contracts, has been taken by the State, since the former hearing, and he testified that the vouchers which were receipted in full by claimant, from time to time during the existence of the contracts were intended to be settlements in full up to their date. That whenever he and the claimant were unable to agree upon the amount due claimant, it was referred to the Commissioners and a settlement was made between them.

Voucher No. 218 issued October 17, 1895, shows on its face that it was a settlement in full to September 1, 1895. Warden Allen swears positively that this was a settlement in full up to that time and the record of the Commissioners shows that there was a settlement made in compromise at that time, differences having arisen between the management of the chair department and the claimant, in regard to the amount of commissions to be allowed him.

The record also shows a number of sales made by claimant where the goods were returned and a number of sales made by him, at prices below the scale agreed upon and that he agreed in all those instances where the Commissioners filled the orders, that he would waive his commissions or that he would take for his commissions such sum, as remained above the cost price of the chairs.

The expert accountant, Walton, testified on cross-examination that in the course of his investigation, he found that there were certain sales for which claimant was not credited with any commissions. That he saw a letter from claimant in which it was stated that he was not to receive commissions on certain sales, unless the profits justified it. He also stated that in a number of instances goods were sold at cost and that no commissions were credited to him on those sales.

There is a letter in the record, dated October 16, 1895, and addressed to the warden and signed by the claimant in which he agrees, in case certain orders then stand-

ing on the books as per list attached, were filled, he would accept in full of his commissions on said orders, the surplus on each sale over such amount, as shall realize the net prices as entered on the estimated cost list. The list attached to the letter contains an itemized list of orders aggregating $23,261.20 and also refers to other orders, the amounts of which are not given.

We think this voucher No. 218, taken in connection with the evidence of Warden Allen and the expert accountant and the record of the Commissioners and the letter of claimant, contained in the record, was intended as an annual settlement in full to the first day of September, 1895. The vouchers issued after that date are receipted in full by claimant and if they were not intended to be in full it seems to us an inventory of the stock on hand would have been demanded by claimant at the time when the contract was mutually annulled, in order to determine whether or not he was entitled to an extra commission. This was not done and we think the vouchers in the record show a complete settlement and adjustment of all accounts between the claimant and the Commissioners.

We therefore see no reason for reversing the judgment of the former Commission and it is therefore ordered that the claim be rejected.